Redacted Version

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### BID PROTEST

| | |
|---|---|
| **BEAR MOUNTAINSIDE REALTY, LLC** | ) ) ) |
| *Plaintiff,* | ) ) |
| **v.** | ) No. **23-457C** ) |
| **THE UNITED STATES,** | ) **(Filed Under Seal)** ) |
| *Defendant.* | ) ) |

### COMPLAINT

Pursuant to 28 U.S.C. § 1491(b), Plaintiff Bear Mountainside Realty, LLC ("Bear Mountainside" or "Plaintiff"), by its undersigned counsel, submits this pre-award bid protest Complaint seeking permanent injunctive and declaratory relief. Bear Mountainside protests the decision by the General Services Administration (the "GSA" or the "Agency") to cancel Request for Lease Proposals No. 7NJ2243 (the "RLP" or "Solicitation").

### INTRODUCTION

1. This protest challenges the decision by the GSA to cancel the RLP. Through this now-cancelled Solicitation, GSA sought to obtain a lease on behalf of the Internal Revenue Service ("IRS" or the "Tenant Agency") for 38,642 American National Standards Institute/Building Owners and Managers Association (ANSI/BOMA) Office Area square feet ("ABOA SF") of office space and 34 parking spaces.

2. The Agency cancelled the Solicitation on November 16, 2022, citing an alleged "change in circumstance." *See Bear Mountainside Realty, LLC*, B-419989.6 et al., Feb. 28, 2023,

2023 WL 2428871.  Bear Mountainside brought a timely protest of the cancellation at the Government Accountability Office ("GAO"), and GAO denied the protest on February 28, 2023. *Id*.

3.    As set forth below, the Agency's decision to cancel the Solicitation was unreasonable and lacked a rational basis.  For over a decade, the Government has taken improper steps to exclude Bear Mountainside from this opportunity and on the previous three solicitations, has attempted to either exclude Bear Mountainside from the competition or disadvantage Bear Mountainside in a way that unfairly advantages its preferred offeror.  Now—for the second time in three years—GSA has summarily cancelled the Solicitation once it became clear that Bear Mountainside was the lowest-priced technically acceptable bidder and in line for award.

4.    Bear Mountainside seeks a determination on the merits that the cancellation was arbitrary and capricious or otherwise violated the law and a permanent injunction enjoining the Agency to re-issue the Solicitation and, in accordance with the Solicitation, make an award to the offeror with the lowest-priced technically acceptable offer.

## PARTIES

5.    Bear Mountainside is a small business property owner and landlord that submitted a timely proposal for this now cancelled procurement.  Its principal address is 200 Sheffield Street, Mountainside, New Jersey, 07092.

6.    Defendant is the United States of America acting through the General Services Administration, a federal agency.

## JURISDICTION AND STANDING

7.    The United States Court of Federal Claims has jurisdiction over this bid protest under the Tucker Act, 28 U.S.C. § 1491(b)(1), which allows the Court to hear "an action by an interested party objecting to . . . a proposed award or the award of a contract" by a Federal agency "or any alleged violation of statute or regulation in connection with a procurement."  The Court's jurisdiction extends to an agency's decision to cancel a solicitation.  *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 125–26 (2010); *FFTF Restoration Co., LLC v. United States*, 86 Fed.Cl. 226, 236–37 (2009).  Here, Bear Mountainside objects to the Agency's arbitrary and capricious cancellation of the Solicitation.

8.    Bear Mountainside was an offeror in this lowest-priced technically acceptable procurement, and as the lowest-priced offeror, Bear Mountainside was in line for award.  Accordingly, Bear Mountainside's direct economic interests were affected by GSA's improper decision to cancel this Solicitation.  In fact, as the lowest-priced technically acceptable offeror, Bear Mountainside would have been awarded the lease.  Bear Mountainside is therefore an "interested party."  *See Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (holding that an "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract").

9.    The Court has jurisdiction to grant the relief requested under the Tucker Act, as amended, 28 U.S.C. § 1491(b)(2), and Rules of the United States Court of Federal Claims ("RCFC") 65.

## BACKGROUND

### A. Bear Mountainside's Lease

10. In 2004, GSA awarded Bear Mountainside a long-term lease of 26,724 ABOA SF of commercial office space on behalf of the IRS (the "Bear Mountainside Lease"). The Bear Mountainside Lease is located in a property at 200 Sheffield Street, Mountainside, New Jersey 07092 (the "Bear Mountainside Property").

11. Although the original lease was set to expire in 2012, GSA has refused to engage in a competitive bidding process for a long-term lease. Instead, GSA has repeatedly commenced solicitations and then cancelled them to prevent the award to Bear Mountainside. As a result, GSA has entered into four short-term lease extensions, the most recent being a two-year extension in 2021. That lease is set to expire in September 2023. The refusal to allow Bear Mountainside to compete for and procure a long-term lease ███████████████████████████████████

███████████   ████████████████████████████████████████

███████████████████████████████████████

12. Throughout this entire period, neither Bear Mountainside nor its predecessor had any material performance issues with GSA or the IRS tenants. IRS employees at the site have repeatedly informed Bear Mountainside that they "love the space" and do not want to move.

### B. The Competing Springfield Lease

13. On June 21, 2007, the IRS leased 27,842 ABOA square feet of commercial space (which has since been expanded to 40,028 ABOA square feet) from Springfield Park Place Co. LP ("Park Place") at 955 S Springfield Ave. (the "Springfield Property"), Springfield, NJ 07081 (the

███████████████████████████████████████████████████

"Springfield Lease").  For years, the IRS has been slowly transferring its operations from the Bear Mountainside Property to the Springfield Property, including the relocation of a Taxpayer Assistance Center ("TAC").  The IRS entered into the Springfield Lease directly, and the GSA subsequently replaced IRS as the Lessee via a lease amendment.

14.  The original term of the Springfield Lease was from February 17, 2008, through February 16, 2013, with a five-year option.

15.  The Springfield Lease has since been extended several times—and never as the result of a competitive bidding process.  In fact, most recently, GSA issued a Justification for Other than Full and Open Competition, Extension ("JOFOC") which provides for a three (3) year, one (1) year firm lease extension to the Springfield Lease, which was previously set to expire on February 16, 2023.

**C.  The First Solicitation and Bear Mountainside's Successful Protest**

16.  Around the time that Bear Mountainside's Lease was set to originally expire in 2012, the Government sought to compete the requirement.

17.  When the Solicitation was originally released, Bear Mountainside's property was included in the delineated area, as shown in the map below:



18.   However, the Government later revised the delineated area and excluded the Mountainside property from it, as shown in the map below:



19.   Bear Mountainside protested its exclusion from the competition, and the Agency promptly took corrective action.  However, rather than let Bear Mountainside compete to retain the Mountainside Lease, the Solicitation was cancelled.

**D.  The Second Solicitation and Bear Mountainside's Successful Protests**

20.   Years after the cancellation of the first solicitation, the IRS was still discussing its needs in the relevant area with one focus being moving its employees out of the Bear Mountainside Property and awarding a noncompetitive lease to Park Place.

21. In a set of emails dating back to *2017*, IRS employees discussed their specific animus towards Bear Mountainside, their refusal to occupy the Mountainside Property should it win a competitive procurement, and their desire to simply award the Springfield Property a noncompetitive lease.[1]

22. In an April 3, 2017 email between IRS employees Thomas Huba, John Lopez, Sonia Lough, and C. McSurdy, various IRS officials stated "what IRS wants to do":

- **The current Mountainside building is unacceptable to IRS. We will not agree to occupy this building if GSA runs a competitive action.**

- Ask GSA to do a "Other than Full and Open Competition" and negotiate with the Springfield lessor for a long term lease. **Doing anything else will be a waste of time for GSA and for IRS. GSA should figure out a way to make this happen so IRS can get rent relief faster.**

- Award a long term lease to the Springfield lessor. A full Tenant Improvement Allowance (TIA) will not be necessary.

- Terminate the Mountainside lease early.

- Consolidate the Taxpayer Assistance Center (TAC) in Mountainside with the existing TAC at the Newark Federal Building (NJ0056).

- Consolidate the other business units in Mountainside at Springfield and at other Northern New Jersey offices occupied by IRS.

Ex. A at 7 (IRS FOIA Production Part 1) (emphasis added).

---

[1] On January 20, 2023, through FOIA, Bear Mountainside requested the IRS and GSA to produce documents related to the Solicitation.

23.  In a number of emails from 2019, the IRS also confirmed its efforts to move employees from the Bear Mountainside Property to the Springfield Property.

24.  In a January 30, 2019 email Mr. Lopez sent to Mr. Huba and Chris Herin, he discussed how the "[p]lans are completed" for "the Mountainside consolidation into Springfield." This also included "the possibility of having the TAC at Mountainside moved to Springfield." *Id.* at 9-10.

25.  A February 1, 2019 email from Mr. Huba to Vickie Fairley and Mr. Lopez stated: "[T]here some planning happening now about exiting the Mountainside office later this year and consolidating staff at the Springfield office." *Id.* at 14.

26.  A March 19, 2019 email from Cindy Weldon of the GSA to Anthony Gamble and Bob Costello of the IRS asked, "I just need in writing that IRS plans to vacate Mountainside and does not expect for GSA to do a lease action." *Id.* at 21.

27.  Mr. Gamble confirmed the IRS's intentions for Ms. Weldon on the same day, stating, "Our intent is to relocate the TAC from Mountainside into Springfield by the end of  the calendar year. With that being said, I am confirming IRS plans to vacate Mountainside and does not expect for GSA to do a lease action." *Id.*

28.  On March 21, 2019, Mr. Gamble circulated his reply to other IRS employees, stating, "Below, is my reply to Cindy Weldon of GSA regarding our intent to move everyone, including the TAC, out of Mountainside. Therefore, GSA is aware of our intentions to completely vacate the Mountainside office. Before we submitted the 120-day letter, we wanted to make sure the Springfield lessor is in agreement to allow IRS to house a TAC in his building." *Id.* at 20.

29.   On March 12, 2020, the IRS formally requested that GSA replace the IRS as the lessee in the Springfield Lease.  The IRS also expressly requested that GSA seek to execute a succeeding lease once the Springfield Lease expired.

30.   One year later, the GSA Contracting Officer was made aware that the GSA Central Office had reached an agreement with the IRS to substitute GSA for the IRS as the lessee.

31.   Roughly two months later, on May 12, 2021, despite knowing that the Springfield Lease was in the process of being transferred into GSA's portfolio, GSA issued an RLP seeking to consolidate the Bear Mountainside Lease and Springfield Lease.

32.   While the IRS was preparing for this new solicitation, in a September 24, 2020 email from Mr. Lopez to Mr. Huba and Morgan Johnson, Mr. Lopez stated, "[H]ere are attachments showing that Mountainside (building #15) is considered within the DA. *I thought that we tried keeping them out* however I remember the fear that GSA has with this lessor and her protest letters."  *Id.* at 30 (emphasis added).

33.   The RLP provided for the award of a fully-serviced 20-year lease of office space in Springfield, New Jersey.  The RLP sought to lease a minimum of 38,642 to a maximum of 40,574 of ABOA SF of contiguous space and 34 exterior parking spaces for us by the IRS.

34.   The RLP provided that award would be made on the basis of the lowest-priced, technically acceptable ("LPTA") offer.

35.   However, the RLP also contained Section 3.07 Tenant Improvements Included in Offer (OCT 2020), which provided two different TI Allowances designed to prevent Bear Mountainside from competing on an equal footing with Park Place.

36. Specifically, the RLP stated the "TI Allowance *for the existing space leased directly by the IRS [in Springfield] is $2.50 per ABOA SF*." However, "*for other locations offered, including the existing space leased directly by GSA [in Mountainside], is $55.62 per ABOA SF*."

37. Thus, despite the fact that the IRS was an existing tenant in both the Bear Mountainside Property and the Springfield Property, only Park Place was required to use the $2.50 TI Allowance, while Bear Mountainside was required to use the $55.62 TI Allowance. The result penalized Bear Mountainside with more than $2 million of additional costs that did not have to be borne by Park Place—despite the fact that both properties were currently leasing space to the IRS.

38. Emails also show that the IRS planned to give Park Place this significant advantage in the Solicitation process when it required Park Place to use the $2.50 allowance and required other offerors, including Bear Mountainside, to use the $55.62 allowance. Email correspondence also shows the IRS tried to simply award a noncompetitive lease to Park Place.

39. In a set of February 6, 2019 emails between IRS officials, Mr. Huba and Mr. Herin, IRS officials stated, "GSA has already agreed to run a modified/reduced TI procurement which gives the incumbent a significant advantage, as long as he doesn't get tricky thinking he can goose the shell rate. GSA will not sole source the existing location." *Id.* at 22.

40. Bear Mountainside highlighted this discrepancy for the Agency, noting that it was unfair to provide Park Place (the owner of the "existing space leased directly by the IRS") a credit and not Bear Mountainside, when Bear Mountainside was also an incumbent lessor, meeting a similar requirement for commercial office space.

41.  Despite numerous attempts to resolve the issue informally and to gain further clarification on the difference in TI Allowances, GSA ultimately informed Bear Mountainside that it had conducted a full IGE and had determined that the Bear Mountainside location would need the full TI Allowance ($55.62).

42.  On July 15, 2021, Bear Mountainside protested the RLP's price requirements and evaluation criteria as unreasonable and unduly restrictive of competition.

43.  On August 2, 2021, the Agency informed GAO that it canceled the RLP because "options not available to the Agency at the beginning of the procurement process have become available and warrant consideration."

44.  On August 5, 2021, GAO dismissed the protest as academic.

45.  On August 11, 2021, Bear Mountainside filed a subsequent protest challenging the Agency's cancellation of the RLP arguing that the Agency's decision to cancel the RLP lacks a rational basis and is otherwise unreasonable and unlawful.

46.  During the second protest, the Agency Report revealed that on July 8, 2021, despite having issued an RLP for its requirements, the Government had already decided to explore the possibility of a succeeding lease for the Springfield Property, and it completed a Cost Benefit Analysis ("CBA") comparing the cost of a succeeding lease at the Springfield Property with the cost of a new lease.  GSA did not seek or obtain informal pricing quotations as part of its analysis, despite the regulatory requirement to do so.

47.  By July 15, 2021, having already completed its CBA in support of a request for a J&A authorizing a succeeding lease, and having already decided to pursue a succeeding lease in

the Springfield Property, GSA nonetheless accepted multiple offers in response to the Solicitation, including Bear Mountainside's offer.

48. Bear Mountainside's offer completely upended the assumptions in the Government's CBA. While the CBA predicted substantial savings through a succeeding lease, Bear Mountainside's low pricing actually provided substantially more savings if the Government were to compete the lease.

49. Despite having Bear Mountainside's offer in its possession, which completely undermined the CBA, the Government nonetheless moved forward with a CBA it knew was flawed in order to obtain a succeeding lease from Park Place.

50. In short, the IRS had been working for nearly 18 months to transfer the Springfield Lease to the GSA, with the IRS's expressly stated goal of having GSA execute a succeeding lease. The GSA Contracting Officer herself became aware of this plan two months before she issued the Solicitation. Then, the Government failed to follow its own regulations in conducting its CBA, the conclusions of which were completely undermined by the proposed pricing from Bear Mountainside. Despite these shortcomings in the Government's process and conclusions, the Government nonetheless relied upon its flawed CBA as the sole basis for cancelling the Solicitation.

51. Once the flawed CBA was produced and the glaring errors exposed by Bear Mountainside, GSA was left with no option but to take corrective action and commit to re-issue the Solicitation.

**E. The Third Solicitation and its Cancellation**

52. On June 16, 2022, GSA re-issued the Solicitation at issue.

53.   On August 24, 2022, Bear Mountainside submitted its proposal offering to lease its property at a significant price discount.

54.   On September 20, 2022, IRS employees Mr. Mount, Mr. Huba, and Mr. Lopez sent emails to each other discussing that they knew Bear Mountainside was going to win the procurement at issue, bemoaning that Bear Mountainside would win, and discussing how to avoid that very outcome.

55.   The first email was sent from Mr. Lopez to Mr. Mount and Mr. Huba:

> Yet another negative E-mail from me on a project that is taking forever and now has taken a complete change. The Territory called a meeting regarding GSA's choice to Award Mountainside the lease instead of Springfield. I was very against even considering Mountainside as the choice. My points were
>
> 1.   How would this even be possible when we just fought not accepting Paterson. GSA has advised that Mountainside is almost half the shell price of Springfield. We have executives that are not satisfied with the inequities in some of our POD's
>
> 2.   We have a long list of deficiencies that were not addressed. I asked the PM to look for those deficiencies so that we can fire back at GSA/Cindy at Tuesday's meeting I informed him that they were under Phil Lamb who was the Section Chief at that time.
>
> 3.   The new owner of this building is a lawyer and has no problem filing an action against GSA which I believe she has done around seven years ago
>
> 4.   There may be an escape hatch here in that the elevator may be undersized as per our POR. In any case they have not been able to have repaired and is always breaking down.
>
> 5.   Springfield is a very nice building and Mountainside has been a harrow. I'll say it again some of our executives are not happy

with some of our inferior buildings. This is not a Counsel Office but we don't want to go through Newark C&A again.

This is the straw that will break my back. As I said before to many twists and terns on all of this Territories projects. Absolutely nothing works out.

Ex. B at 6-7(IRS FOIA Production Part 2).

56. Mr. Huba later replied to Mr. Lopez's email, stating:

How did we learn that the award was going this way? DON'T SIGN ANYAWARD LETTERS. Can we have a full discussion on this tomorrow because we in Portfolio will probably need to lead the decision and messaging to GSA.

I wonder sometimes how we get to this point. If there was a market survey, why did we not tell GSA to eliminate a building. *Sure would have a letter on file telling GSA that we will not occupy Mountainside if awarded*. That's where we are heading now unfortunately. Before the meeting next week, I would like to know if FMSS put up any resistance. Since a challenge was filed earlier, I assume that GSA tried to eliminate this Offerer. Was there an SSLDT done and did we participate in providing input? Now, we should know what GSA will demand of this Lessor relative to building improvements, responsiveness, upgrades, swing space, etc. I also am interested in being updated on the project plan such as how much square footage we would be taking, how much did the solicitation ask for, etc.

*Id.* at 6 (emphasis added).

57. Mr. Lopez then replied, stating:

1. We learned that Mountainside would probably win the Award at a Pre-award

2. *GSA was informed that we did not want this building* GSA said that they were concerned with litigation proceedings

3. *GSA knows that we have repeatedly did not want Mountainside*

4. The action was for 38,642 USF

5. The ROM shows that the project cost for Springfield is $300,000 and a buildout at Mountainside would be over $3 mil. GSA is showing that it would be $4 mil at both locations (IGE).

*Id.* (emphasis added).

58. Finally, Mr. Huba responded again, stating:

OMG! What kind of scope did GSA use for Springfield? I know we needed a TAC built and maybe some CI alterations. But that should have been it. I'm happy to see the ROM we prepared was only $300K but someone must have messed with the scope at sometime for GSA to have such a wild number. You are right John. We should have made the territory move from Mountainside into Springfield two years ago when we talked about it. Please see if you can get the IGEs.

*Id.*

59. Following these emails confirming that Bear Mountainside was going to win the procurement, on September 30, 2022, GSA reached out to Bear Mountainside to confirm its pricing:

Hi Austin,

I wanted to circle back with you on your Springfield offer. Before we call for final proposals we are taking another look at offers and we noticed that your offered shell and operating rent is very low, well below the market range. You will be required to fully perform under the lease, as detailed in Sections 3 and 6. Additionally, you will be required to build out the space to a shell condition as detailed in Section 3. There will be no option to increase your rate down the road in the lease term, so please ensure that the rate you are offering allows you to fully perform to the lease standards.

Can you please confirm that your rate allows you to successfully perform under the lease requirements, or adjust your rate accordingly?

Please let me know if you have any questions or concerns.

Thanks,

Adam Katz
GSA Authorized Representative
Broker Contractor

Ex. C at 2 (Email Between GSA and Bear Mountainside).

60.  On October 3, 2022, Bear Mountainside responded, refusing to increase its bid and stating: "Hi Adam, Yes all good. They have existing GSA leases in the building so they know the drill." *Id.*

61.  Once GSA had this confirmation that Bear Mountainside's pricing was simply unbeatable in this lowest-priced technically acceptable procurement, it only took them two weeks—even with a Federal holiday—to simply cancel this Solicitation.

62.  However, in explaining why it decided to cancel the Solicitation, GSA could not admit that Bear Mountainside was not the IRS's preferred bidder.  Instead, GSA chose to describe the reasons for its cancellation in as broad and generic a way as possible.  Thus, on November 16, 2022, GSA cancelled the Solicitation, stating: "The Government is hereby cancels [sic] the RLP due to a change in circumstances. The Government is reevaluating requirements. It is, therefore, in the best interest of the Government to cancel the RLP."  Ex. D at 3 (Notice of Cancellation).

63.  Despite claiming that its needs have changed, GSA did not explain how or why they had changed.  Indeed, the Government's utilization of Bear Mountainside's and Park Place's properties has remained constant, showing that the Government has not had any material change in circumstances and continues to need the original requirements in the Solicitation.

**F.  Bear Mountainside's Protest**

64. Bear Mountainside timely protested the Agency's decision to cancel the solicitation at GAO on November 28, 2022.

65. During the protest, Bear Mountainside confirmed that GSA improperly cancelled the Solicitation.

66. GSA relied only on a single email from the IRS, totaling five substantive sentences, to cancel the Solicitation. This email is the only contemporaneous document in the Agency Report discussing IRS's request to cancel the Solicitation.

67. The email stated:



Ex. E at 2 (Email from IRS to GSA).

68. GSA provided no documentation that it had reviewed or considered the reasonableness of IRS's request.

69. This email is also at odds with the cancelled Solicitation.

70. The Government indicates it needs to move to the ▮▮▮ area in order to have closer proximity to public transportation. The public transportation requirement was already in the Solicitation, but much more importantly, there is a major New Jersey Transit bus hub co-located at the Mountainside Property. The IRS provides no justification for why ▮▮▮▮▮▮▮▮▮▮▮, or whether its employees are better served by one or the other. But in any event, the Mountainside Property is served by two NJ Transit commuter lines, with stops less than 10 minutes from Bear

Mountainside's location. So the requirement for public transit does not require a move to a new delineated area. And perhaps most importantly, the Springfield Lease has no public transit within a mile, and yet the Government intends to remain in that lease.

71. The remaining items in the Government's "changed requirements" are even more clearly pretextual. Additional space and storage space were both available at the Bear Mountainside Property. After more than a decade at Bear Mountainside's building, the Government was fully aware of both the available space and the proximity to public transportation.

72. Further, the fact that the Government will terminate Bear Mountainside's Lease, but not the Springfield Lease, demonstrates that this cancellation was intended to harm Bear Mountainside and favor Park Place. The Government could have cancelled the Springfield Lease and extended the Bear Mountainside Lease but chose not to do so (even though the Springfield Lease has never been competitively bid). The requirements for this Solicitation are currently being met through the Springfield Lease. Cancelling the Solicitation ensures those requirements will continue to be met through the Springfield Lease indefinitely, while denying Bear Mountainside the fair opportunity to compete for this work

73. Finally, during the course of the protest, the IRS changed its reasoning for justifying canceling the Solicitation, putting it at odds with the original email seeking cancellation.

74. While the original email cited IRS needing *more* and different types of space and the need for proximity to ███████████████, a statement from IRS provided to GAO during the protest stated that the changed requirements resulted from IRS's return to office activities after Covid and that a *consolidation or reduction* in space was now likely.

75. Despite these improprieties, on February 28, 2023, GAO denied Bear Mountainside's protest. *See Bear Mountainside Realty, LLC*, B-419989.6 et al., Feb. 28, 2023, 2023 WL 2428871.

### G. The Springfield Lease's Extension

76. As previously discussed, on March 1, 2023, GSA extended the Springfield Lease for three years, one year firm.

77. GSA awarded the extension on a sole-source basis.

78. The JOFOC for the sole-source extension stated that market research for Springfield, NJ, showed that the rental rate for the area ranged from $30.03 to $46.46 per rentable square feet ("RSF").

79. The JOFOC stated that it would only cost $27.99 per RSF to extend the Springfield Lease.

80. This analysis however, ignores the fact that Bear Mountainside submitted an offer ▮▮▮▮▮▮▮▮▮▮ and had property ready for the IRS's use, a fact known to GSA given Bear Mountainside's offers in the previous solicitations.

81. In fact, the IRS is currently occupying space at the Bear Mountainside Property and would not have to commit resources to substantial tenant improvements or relocation costs. Moreover, over time the IRS has been unilaterally moving employees and operations from the Bear Mountainside Property to the Springfield Property, including the TAC office.

## COUNT I

### The Agency's Decision to Cancel the RLP Lacks a Rational Basis and Contravenes Procurement Law

82. The allegations of paragraphs 1 through 81 are hereby incorporated by reference.

83. This Court reviews bid protests under the APA standard of review, requiring this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); 28 U.S.C. § 1491(b)(4). Thus, a procurement action "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)

84. Agency action is arbitrary and capricious where, as here, the "agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in its view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.- Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (alteration in original).

85. Still further, the "FAR section 1.602-2(b) requirement that contracting officers shall '[e]nsure that contractors receive impartial, fair and equitable treatment' is, among other things, the codification of the government's duty, previously implicit, to fairly and honestly consider bids." *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 523 (2011) (alteration in original). Therefore, FAR 1.602-2(b) "is violated by government actions which would have breached the implied duty to fairly and honestly consider bids, and thus such actions—including arbitrary cancellations of solicitations—would be the 'violation of . . . regulation in connection with a procurement.'" *Id.* at 524 (alteration in original).

86. Here, the Agency has violated each of the foregoing regulations and principles governing cancellation decisions.

87. In defense of its decision to cancel the Solicitation, GSA provided a single email from the IRS claiming the Solicitation requirements had changed because the IRS allegedly needed more and different types of space than were provided in the Solicitation and that it may need to relocate to another area for proximity to ███████████████████.

88. This justification for the cancellation was, on its face, inconsistent with the IRS's stated intention to remain in the Springfield Lease, a lease which currently meets the requirements of the now-cancelled Solicitation and which GSA has extended by three years (one year firm) since the GAO decision was issued. At the same time, the IRS has stated an intent to terminate the Bear Mountainside Lease, which is set to expire later this year.

89. Accordingly, GSA's acceptance of the IRS's stated bases for cancellation lacked a rational basis and was therefore unreasonable.

90. The arbitrary and unlawful decision to cancel the Solicitation prejudices Bear Mountainside. As the lowest-priced offeror, Bear Mountainside would have received the award if GSA had made an award based on the existing proposals. Bear Mountainside also would have had a substantial chance of award under any amended Solicitation.

91. The Court should issue a permanent injunction requiring the Agency to re-issue the Solicitation and to make an award decision in accordance with the terms thereof. Bear Mountainside would be irreparably harmed if the requested injunction is not granted because it will have lost the opportunity to fairly compete for the award and has no adequate remedy for that loss in the absence of an injunction. *See MORI Assocs.*, 102 Fed. Cl. at 552-53 (finding irreparable

harm and issuing injunction where agency improperly cancelled solicitation); *see also Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) ("The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract.").

92.   The public interest also favors injunctive relief to remedy the procurement errors and violations of law identified herein and to prevent loss of public trust and confidence in the integrity of these procurements. *See, e.g., Palantir USG*, 129 Fed. Cl. at 294-95 (citing *BINL, Inc. v. United States*, 106 Fed. Cl. 26, 49 (2012) ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law.")); *Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 430 (2018) ("[A]n injunction will promote the integrity of the procurement process by holding the government accountable when it takes actions that are contrary to law and may result in cost-savings for the government.").

93.   The balance of hardships favors Bear Mountainside.   There would be no significant harm to the Agency from an injunction requiring it to correct its own procurement errors.  Any alleged delay claimed by the Agency is a self-inflicted injury based on the Agency's failure to conduct the procurement in a rational, lawful manner. *See, e.g., Univ. Research Co., LLC v. United States*, 65 Fed. Cl. 500, 515 (2005) (granting injunction and recognizing that "the public's interest in the integrity of the procurement process outweighs the public's interest in the timely completion of the government procurement process"); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (Fed. Cl. 2003) ("only in an exceptional case would [such delay] alone warrant a denial of injunctive relief").

## COUNT II

████████████████████████████████████████████████
██████████████████████████████████████████

**The Agency's *Post Hoc* Justification for the Cancellation Results in a Conflicting and Incoherent Basis for Its Cancellation Decision**

94.   The allegations of paragraphs 1 through 93 are hereby incorporated by reference.

95.   The Supreme Court has made clear the Court must treat the Agency's reasoning provided in the heat of the GAO litigation as *post hoc* rationalization:

> Because Secretary Nielsen chose to elaborate on the reasons for the initial rescission rather than take new administrative action, she was limited to the agency's original reasons, and her explanation "must be viewed critically" to ensure that the rescission is not upheld on the basis of impermissible "*post hoc* rationalization." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814. But despite purporting to explain the Duke Memorandum, Secretary Nielsen's reasoning bears little relationship to that of her predecessor. Acting Secretary Duke rested the rescission on the conclusion that DACA is unlawful. Period. See App. to Pet. For Cert. 117a. By contrast, Secretary Nielsen's new memorandum offered three "separate and independently sufficient reasons" for the rescission, *id.*, at 122a, only the first of which is the conclusion that DACA is illegal. . . .
>
> Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155, 132 S.Ct. 2156, 183 L.Ed.2d 153 (2012) (internal quotation marks omitted). Permitting agencies to invoke belated justifications, on the other hand, can upset "the orderly functioning of the process of review," *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943), forcing both litigants and courts to chase a moving target. Each of these values would be markedly undermined were we to allow DHS to rely on reasons offered nine months after Duke announced the rescission and after three different courts had identified flaws in the original explanation.
>
> . . . . The functional reasons for requiring contemporaneous explanations apply with equal force regardless of whether post hoc

justifications are raised in court by those appearing on behalf of the
agency or by agency officials themselves.

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1908-09 (2020)
(overturning agency action).

96.   The IRS originally claimed that it needed to cancel the Solicitation because it
needed more and different types of space than the Solicitation sought and that it may need to
relocate to another area for proximity to ███████████████████ .

97.   As a new, belated justification, the IRS now claims that it is still reviewing its needs
following its post-COVID Return to Office effort and that it may need to consolidate offices and
reduce, instead of increase, its space requirements.

98.   The two conflicting statements were provided by different IRS personnel in
different management chains, but there is no explanation of whose opinion is controlling and which
opinion could be relied upon by GSA.   At a minimum, the Government's flip-flop critically
undermines the Agency's justification for cancellation.

99.   Because the IRS has now provided two conflicting and irreconcilable bases for the
cancellation of the Solicitation, and because it is entirely unclear which opinion is controlling,
GSA has no rational basis for the cancellation of the Solicitation, which was therefore
unreasonable.

100. The Court should issue a permanent injunction requiring the Agency to re-issue the
Solicitation and to make an award decision in accordance with the terms thereof.   Bear
Mountainside succeeds on the merits, as discussed above.  Bear Mountainside would be irreparably
harmed if the requested injunction is not granted because it will have lost the opportunity to fairly
compete for the award and has no adequate remedy for that loss in the absence of an injunction.

The balance of hardships favors Bear Mountainside. There would be no significant harm to the Agency from an injunction requiring it to correct its own procurement errors. Lastly, the public interest would be better served by granting the injunction because the public's interest lies in preserving the integrity of competitive procurements.

## COUNT III

### The Agency's Decision to Cancel the RLP is Arbitrary and Capricious with Respect to the Agency's Inadequate Documentation

101. The allegations of paragraphs 1 through 100 are hereby incorporated by reference.

102. An agency's decision to cancel a procurement must have a contemporaneously documented, reasoned basis. *See, e.g., Starry Assocs., Inc. v. United States*, 127 Fed. Cl. 539, 549-50 (2016) (agency's decision to cancel solicitation after corrective action and sustained protest at GAO was arbitrary and capricious where the "contemporaneous record is devoid of any documentation . . . on which the agency can pin the rationality of its decision to cancel"); *Macaulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 602-05 (2016) (agency's desire to make changes to solicitation did not provide rational basis for cancellation of government contract awards and resolicitation of procurement); *see also Seventh Dimension, LLC. v United States*, 160 Fed. Cl. 1, 24 (citing cases for the proposition that "[t]he APA's standard of review requires more than mere assumptions, hypotheses, and guesses—it requires reasonable conclusions based on facts or other record evidence").

103. "For a cancellation decision to be found not to be arbitrary and capricious, the agency must have examine[d] the relevant data and articulate[d] a satisfactory explanation, this explanation must be coherent and reasonable, and it must not entirely fail[] to consider an important aspect of the problem or run[] counter to the evidence before the agency." *MORI*

*Assocs.*, 102 Fed. Cl. at 543-44 (citations omitted) (finding permanent injunction rescinding cancellation warranted).

104. Where (as here) the Agency seeks to justify its cancellation based on changed needs, the Agency's justification for cancelling the Solicitation raises the question of "whether Government modifications changed the contract enough to circumvent the statutory requirement of competition." *See AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). A procurement can continue and accommodate a change that "generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause[.]" *Id.*; *see also Golden Mfg. Co., Inc. v. United States*, 107 Fed. Cl. 264 (2012) (denying protest alleging cardinal change in procurement).

105. Cancellation of a lease procurement involves specific steps. In this regard, GSAR 570.303-4 governs GSA's decision to amend or cancel a lease procurement:

> If the Government's requirements change, either before or after receipt of proposals, issue an amendment. Document the amendment using the same method as for the SFO, written or electronic.
>
> ****
>
> If there are changes to the Government's requirements for amount of space, delineated area, occupancy date, and/or other major aspects of the requirements, the contracting officer shall consider whether there is a need to readvertise, and to document the file accordingly.

48 C.F.R. § 570.303-4.

106. The Agency has violated each of the foregoing regulations and principles governing documentation of cancellation decisions.

107. First, the Agency does not have a cancellation decision at all. The IRS provided GSA with only one email in support of its request to cancel the Solicitation. This email consisted of less than 10 sentences from the IRS claiming the Solicitation requirements had changed because the IRS allegedly needed more and different types of space than were provided in the Solicitation, and that it may need to relocate to another area for proximity to ████████████████████.

108. GSA never undertook the analysis necessary to cancel a procurement. The GSA Contracting Officer did not explain why GSA could not simply modify the RLP to address any concerns. Nor did the GSA or IRS provide any substantiating data or evidence.

109. In fact, there is no contemporaneous documentation of the GSA Contracting Officer or any other GSA personnel reviewing or considering the reasonableness of the IRS's request.

110. Moreover, the IRS's *post hoc* justification for the cancellation, provided only at the direction of GAO, consists of two pages and expressly contradicts the bases for cancellation provided in the original email from the IRS.

111. There is no documentation in the record that establishes which, if either, basis for the cancellation is controlling and which, if either, could be relied upon by GSA.

112. Collectively, the record does not provide enough documentation for this Court to determine the reasonableness of the cancellation, which must therefore be set aside.

113. The Court should issue a permanent injunction requiring the Agency to re-issue the Solicitation and to make an award decision in accordance with the terms thereof. Bear Mountainside succeeds on the merits, as discussed above. Bear Mountainside would be irreparably harmed if the requested injunction is not granted because it will have lost the opportunity to fairly compete for the award and has no adequate remedy for that loss in the absence of an injunction.

The balance of hardships favors Bear Mountainside.  There would be no significant harm to the Agency from an injunction requiring it to correct its own procurement errors.  Lastly, the public interest would be better served by granting the injunction because the public's interest lies in preserving the integrity of competitive procurements.

## COUNT IV

### The Agency's Decision to Cancel the RLP is Pretextual and a Result of Bad Fair and/or Bias

114. The allegations of paragraphs 1 through 113 are hereby incorporated by reference.

115. The Agency lacks the "unfettered discretion to cancel procurements" for unsupported or pretextual reasons.  *126 Northpoint Plaza Ltd. P'ship v. United States*, 34 Fed. Cl. 105, 112 (1995) (sustaining protest and enjoining government from cancelling procurement because the sole reason for the cancellation was to avoid working with the chosen contractor); *see also Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1151 (Fed. Cir. 1994) ("The record . . . amply supports the trial court's findings that the Government's justifications for cancellation of the procurement were pretextual and incredible. Without a valid reason for cancelling the procurement, this court sustains the trial court's conclusion of law that the government violated its duty to conduct a fair procurement." (citation omitted)).

116. The facts set forth in this Complaint indicate that the Government has undertaken the cancellation for reasons other than stated.  For years, the IRS and GSA have taken extraordinary measures to steer business away from Bear Mountainside.

117. Further, the IRS's FOIA production confirms that IRS employees have tried to exclude Bear Mountainside from competition for years, going so far as to say they will refuse to occupy the Bear Mountainside Property should it win a competitive procurement.

118. These efforts included the refusal of GSA to provide an incumbent's price discount for the initial iteration of the Solicitation, despite the fact that Bear Mountainside was one of the incumbents submitting offers; in connection with this decision, GSA noted that the requirements covered by this Solicitation are currently being met by Park Place.

119. The IRS's FOIA production confirms that the IRS did this to specifically give a significant advantage to Park Place to the detriment of Bear Mountainside.

120. The IRS's efforts to exclude Bear Mountainside also included an earlier cancellation of the Solicitation based upon a claim that the Government could extend the Springfield Lease at a lower cost, despite having evidence in its possession that Bear Mountainside's proposal represented a cost savings to the Government. Faced with clear evidence of its improper acts, GSA took corrective action and re-issued the Solicitation.

121. For the most recent cancellation of the Solicitation, the IRS did not request cancellation until it was clear—as acknowledged in an email from the GSA leasing broker—that Bear Mountainside's proposed rent was well below market, making Bear Mountainside the lowest-priced technically acceptable bidder and in line for lease award.

122. The IRS's FOIA productions show that the IRS was aware that Bear Mountainside would win the procurement and discussed that they would not occupy the Bear Mountainside building should it win the procurement.

123. The IRS initially requested that GSA cancel the Solicitation based upon a need for more and different space than called for in the Solicitation, despite the fact that the IRS and GSA have expressly acknowledged that the Springfield Lease currently meets the Government's requirements

124. The IRS completed the negotiation of its post-COVID remote work policy with its employee union nearly a year ago, before the GSA re-issued the Solicitation, and yet the IRS now claims that it needs to reevaluate its requirements based upon the fact that it is still in the process of evaluating its requirements following the post-COVID Return to Office effort.

125. At the request of the IRS, GSA has now also executed a lease extension with Park Place, while indicating that it intends to terminate the Bear Mountainside Lease when it expires in September.

126. This lease extension is also the culmination of the IRS's efforts to continuously occupy the Springfield Property without any competitive procurements, as confirmed by the IRS's FOIA productions.

127. The IRS's years of extraordinary efforts to steer business away from Bear Mountainside, culminating most recently with a cancellation of a Solicitation that took place only after Bear Mountainside had established itself as the lowest-priced technically acceptable bidder and that was based upon incoherent and conflicting rationales, reflect a specific animus against Bear Mountainside and demonstrates that the stated basis for the cancellation of this Solicitation was pretextual and the result of bad faith or bias, as confirmed by the IRS's FOIA production.

128. GSA's cancellation of the Solicitation was therefore unreasonable.

129. The Court should issue a permanent injunction requiring the Agency to re-issue the Solicitation and to make an award decision in accordance with the terms thereof. Bear Mountainside succeeds on the merits, as discussed above. Bear Mountainside would be irreparably harmed if the requested injunction is not granted because it will have lost the opportunity to fairly compete for the award and has no adequate remedy for that loss in the absence of an injunction.

The balance of hardships favors Bear Mountainside. There would be no significant harm to the Agency from an injunction requiring it to correct its own procurement errors. Lastly, the public interest would be better served by granting the injunction because the public's interest lies in preserving the integrity of competitive procurements.

## **PRAYER FOR RELIEF**

WHEREFORE, Bear Mountainside requests that this Court:

i.   Issue declaratory relief declaring that the Agency's cancellation of the Solicitation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and that Bear Mountainside was prejudiced by this improper action.

ii.  Issue a permanent injunction (a) to vacate the Agency's cancellation of the Solicitation; (b) to require the Agency to reissue the Solicitation and make an award decision in accordance with the Solicitation; and (c) to prevent termination of the Bear Mountainside Lease.

iii. Order such other and further relief as the Court deems just and proper.

Dated:  March 31, 2023                     HOLLAND & KNIGHT LLP


  s/ Gordon Griffin
Gordon Griffin
1800 17th Street, N.W., Suite 1100
Washington, District of Columbia 20006
Phone: 202-469-5122
Fax: 202-955-5564
Email: gordon.griffin@hklaw.com

*Attorney of Record for Plaintiff,*
*Bear Mountainside Realty LLC*

Of Counsel:

Hillary J. Freund
Richard Ariel
Holland & Knight LLP
1800 17th Street, N.W., Suite 1100
Washington, District of Columbia 20006
Email: hillary.freund@hklaw.com
        richard.ariel@hklaw.com